IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br><br><br>vs.<br><br>BRANDON KEITH THOMPSON,<br><br>Defendant. | MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS<br><br><br><br>Case No. 2:04-CR-795 TS |

Defendant Thompson filed this Motion to Suppress on April 19, 2005, seeking to suppress statements and physical evidence.  An evidentiary hearing was held on the Motion on June 21, 2005.  Defendant filed a Memorandum of Points and Authorities in Support of the Motion to Suppress on July 26, 2005.  The government, after being granted an extension of time, filed a Memorandum in Opposition to the Motion to Suppress on August 19, 2005.  Defendant was then granted a Motion to Extend Time to supplement the record in this case.  Defendant was given until October 17, 2005, to do so.  The Court has not received any further materials from Defendant, therefore the record is complete and this matter is ready for decision by the Court.

## I.  FINDINGS OF FACT

For the purposes of this Motion, the Court finds the following facts.  As of June 2004, Thompson was on parole and was subject to supervision by Adult Probation and Parole ("AP&P").  Thompson entered into a parole agreement with the Utah State Board of Pardons and Parole.  Part of that agreement was that Thompson establish and reside at a residence of record and not change addresses without obtaining approval from his parole officer.  The parole agreement also contained certain conditions agreeing to home visits and warrantless searches by AP&P agents.

In June of 2004, Thompson's compliance with his parole supervision was very poor as a result of a number of parole violations and his failure to meet with his current parole officer, Officer Breinholt.  By June 1, 2004, Thompson was considered a fugitive and a warrant had been issued for his arrest by the Utah Board of Pardons.

Also on June 1, 2004, a supervisor for AP&P received a call from Detective Wilkins with the South Salt Lake City Police Department.  Detective Wilkins called regarding a shooting that had occurred in South Salt Lake and informed the supervisor for AP&P that Thompson may have been involved in this shooting somehow.  Detective Wilkins was also able to provide an address for Thompson which Officer Breinholt was unaware of.

Officer Breinholt and others responded to this new address and found Thompson's wife at this address.  Officer Breinholt had always known Thompson to live with his wife when he was not incarcerated.  Thompson's wife stated that Thompson did live there, but that he was not at home.  She stated that she did not know where he was and did not know when he would return.  Officer Breinholt asked what kind of car Thompson was driving and Ms. Thompson informed him that Thompson was driving a teal green Grand Am.  Officer Breinholt told her to have

2

Thompson call him when he returned.  Officer Breinholt also informed Ms. Thompson of the consequences of harboring a fugitive.

The following morning, Officer Breinholt drove by that same residence while on his way to work.  He noticed a teal green Grand Am parked outside the residence.  Officer Breinholt called for back up and was soon joined by officers from AP&P, Salt Lake City, and South Salt Lake.  At the evidentiary hearing, Officer Breinholt testified that he had reasonable suspicion to believe that Thompson was inside the residence and that he was in violation of his parole. Officer Breinholt's intent was to take Thompson into custody pursuant to the arrest warrant.

When backup arrived, Officer Breinholt and the other officers spent approximately fifteen minutes knocking on doors and yelling through open windows around the house.  They received no response.  At some point, one of the officers telephoned the Salt Lake County District Attorney's Office seeking to make sure that they had the authority to enter the home.  That officer told the others that he had talked to a district attorney, who had told him that the officers were permitted to go in.  At the evidentiary hearing, Officer Breinholt testified that a couple of different district attorneys had been called.

At this point, Officer Breinholt and another officer went to the back of the home where there was an unlocked and partially opened sliding glass door.  There was a wooden peg inside the door which prevented it from sliding open completely.  Officer Breinholt again yelled through the door and thought he saw movement inside the house.  He continued to yell and received no response.  At that point, Officer Breinholt reached inside the glass door, popped out the wooden peg, and opened the door.  Officer Breinholt entered the home with his gun drawn and moved some vertical blinds.  He saw Thompson standing at the bottom of some stairs on the main level of the home.

3

When Officer Breinholt saw Thompson, he ordered him to place his hands where the officers could see them and ordered Thompson to lie down in the prone position. After that, Thompson was handcuffed. Officer Breinholt then asked if anyone else was in the home and if there were any weapons in the home. No *Miranda* warnings were given before Officer Breinholt asked these questions. Thompson responded that there were guns in the house. An officer then asked Thompson where the guns were located and Thompson responded that they were upstairs. Thompson then made other statements concerning the guns and a person named "Ramon."

Once Thompson was taken into custody, the officers searched the home looking for the firearms. One firearm was found upstairs under some pillows and the other four guns were found in a computer case. At that point, a South Salt Lake Police evidence technician was called to photograph and collect the firearms.

Thompson was transported to the South Salt Lake Police Department and was questioned about the shooting incident.[1] After this, Officer Breinholt and another officer transported Thompson to the Utah State Prison. During this transport, Officer Breinholt and Thompson had a conversation. At no time during this conversation was Thompson issued a *Miranda* warning. While Officer Breinholt has testified that Thompson initiated this conversation and was volunteering information, Officer Breinholt also testified that he asked Thompson some questions. During this conversation, Thompson told the officers that they had missed an AK-47 and other assault rifles during their search. Thompson told the officers where these weapons were located and made further statements about "Ramon."

---

[1]The Court, on July 19, 2005, ordered the suppression of the statements made during this interrogation pursuant to a stipulation of the parties that Thompson was subject to custodial interrogation without having received a *Miranda* warning. *See* Docket No. 40.

4

On June 3, 2004, Officer Olive, an agent with AP&P, went to the Utah State Prison to interview Thompson.  Officer Olive had not previously been involved in the investigation and was not present during Thompson's arrest.  When Officer Olive arrived, Thompson was at the prison infirmary.  Officer Olive spoke with someone at the infirmary—Officer Olive believed this person was a medical technician—who gave Officer Olive permission to interview Thompson.

Prior to beginning the interview, Officer Olive read a *Miranda* warning to Thompson. Officer Olive also gave Thompson a written copy of the *Miranda* warning which defendant signed.  Defendant agreed to waive his *Miranda* rights and agreed to speak with Officer Olive. That interview was recorded.

During the interview, Thompson was emotional and cried a lot.  Thompson asked Officer Olive to stop recording the interview a few times and Officer Olive complied with these requests. Officer Olive testified that at no time did Thompson withdraw his consent to be interviewed or request legal counsel.  Further, although Thompson was emotional during the interview, Officer Olive testified that Thompson seemed rational throughout the interview and tracked his questions well.

## II.  DISCUSSION

Defendant Thompson seeks to suppress: (1) statements made by him at his residence; (2) statements made by him during transport to the Utah State Prison; (3) statements made at the Utah state prison; (4) all three of the above statements based on voluntariness grounds; and (5) physical evidence found during the search of his residence.  The Court will address each of these points separately.

A.  STATEMENTS MADE BY THOMPSON AT HIS RESIDENCE

Thompson seeks to suppress statements made by him at his residence shortly after his arrest.  He argues that these statements were made without the benefit of *Miranda* warnings and, therefore, must be suppressed.  The government, however, argues that these statements may be admitted under the public safety exception to *Miranda* recognized in *New York v. Quarles*.[2]

In *Quarles*, the Supreme Court recognized a "narrow exception" to *Miranda*.[3]  In that case, police officers were approached by a woman who told them she had just been raped by a man carrying a gun.[4]  The officers spotted the defendant and pursued him.[5]  When the officers finally caught up to him, they realized that the defendant's shoulder holster was empty.[6]  The officer asked where the gun was and the defendant stated "the gun is over there."[7]  At that point, the officer read the defendant his *Miranda* rights.[8]

Under those circumstances, the Court held that the defendant's pre-*Miranda* statements were admissible.[9]  The Court stated "that the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth

---

[2]467 U.S. 649 (1984).

[3]*Id*. at 658.

[4]*Id*. at 652.

[5]*Id*.

[6]*Id*.

[7]*Id*.

[8]*Id*.

[9]*Id*. at 655–56.

Amendment's privilege against self-incrimination."[10] The Court noted that officers will be able to distinguish "between questions necessary to secure their own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect."[11]

This case is very similar to *Quarles*. Here, the officers entered the home and quickly took Thompson into custody. Immediately after Thompson was taken into custody, the officers asked if there were weapons in the home and if there were other people in the home. This was done, as Officer Breinholt testified, for officer safety reasons. Therefore, Thompson's statements made in response to the questions of whether there were weapons in the home and whether there were other people in the home are admissible under the public safety exception recognized in *Quarles*.

The Court now turns to whether the statements made by Thompson soon after he was placed in custody must be suppressed. Once Thompson was placed in custody, he made statements that the guns belonged to Ramon, that Ramon was a member of the Mexican Mafia, and that Ramon was going to kill him because he knew too much. As noted previously, no *Miranda* warning was given to Thompson before these statements were made.

The Supreme Court noted in *Miranda* that "[v]olunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today."[12] The Court finds that the statements made by Thompson after he had answered the officer's questions regarding weapons and individuals in the house were volunteered statements. The officers did not ask who the weapons belonged to, or any similar question. The officers only

---

[10]*Id*. at 657.

[11]*Id*. at 659.

[12]384 U.S. 436, 478 (1966).

asked if there were weapons in the home and if other people were in the home.  The officers

asked no more questions and sought nothing more from Thompson after he answered these

questions.  Thompson's further statements were volunteered and, therefore, are not within the

reach of *Miranda*.  Consequently, these statements are admissible, despite the lack of a *Miranda*

warning.

B.  STATEMENTS MADE BY THOMPSON DURING TRANSPORT

The Court turns next to the statements made by Thompson to Officer Breinholt and

another officer while Thompson was being transported to the Utah State Prison.  Thompson and

Breinholt had a conversation during Thompson's transport to the prison.  Officer Breinholt's

testimony at the evidentiary hearing, however, raises a question about who initiated the

conversation and whether Thompson volunteered this information.  Officer Breinholt testified

that it was Thompson who initiated the conversation.  But Officer Breinholt also stated that he

"asked" Thompson some questions.

*Miranda* warnings are required when a defendant is subject to custodial interrogation.[13]

There is no question here that Thompson was in custody.  The issue is whether he was subject to

interrogation.  The Supreme Court has stated that interrogation is "express questioning or its

functional equivalent."[14]  The term 'interrogation' "refers not only to express questioning, but

also to any words or action on the part of the police (other than those normally attendant to arrest

and custody) that the police should know are reasonably likely to elicit an incriminating response

---

[13]*Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

[14]*Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980).

from the suspect."[15]  That definition includes "words or actions on the part of police officers that

they *should have known* were reasonably likely to elicit an incriminating response."[16]

In this case, there is at least some evidence of express questioning of Thompson by

Officer Breinholt.  While Officer Breinholt stated that Thompson initiated the conversation and

made his statements spontaneously, this is difficult to believe considering that Officer Breinholt

repeatedly stated that he "asked" Thompson about several matters.  Even if Thompson did

initiate the conversation, however, *Miranda* warnings were required before Officer Breinholt

could begin questioning Thompson about these statements.  For these reasons, the Court finds

that Thompson was subject to custodial interrogation while being transported to the prison.

Since Thompson was not given a *Miranda* warning, the statements made by Thompson while

being transported to the prison must be suppressed.

C.  STATEMENTS MADE BY THOMPSON AT THE UTAH STATE PRISON

On June 3, 2004, the day after he was arrested, Officer Olive interviewed Thompson at

the Utah State Prison.  When Officer Olive arrived, Thompson was at the prison infirmary and

Officer Olive obtained the permission of someone at the infirmary prior to speaking with

Thompson.  Before interviewing Thompson, Officer Olive advised him of his *Miranda* rights and

Thompson waived those rights and agreed to speak to Officer Olive.  The Court notes that this

was the first time during the course of this investigation that Defendant had been advised of his

*Miranda* rights.  Thompson seeks to suppress the statements made by him at the prison, after

---

[15]*Id* at 301 (footnote omitted).

[16]*Id*. at 302.

receiving and waiving his *Miranda* rights, because that statement had been tainted by his previous unwarned statements.

In *Oregon v. Elstad*,[17] the Supreme Court addressed the admissibility of a subsequent statement, given after a *Miranda* warning, where the defendant had previously made a statement without the benefit of a *Miranda* warning.  In that case, police officers spoke with the defendant in his living room and told him they were there to investigate a robbery in the neighborhood.[18] The defendant told the officers that he was there and he was transported to the Sheriff's headquarters.[19]  Approximately one hour later, the defendant was advised of his *Miranda* rights, waived them, and gave a full statement.[20]  The Court stated that "absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion.  A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement."[21]  The Court held that the second statement was admissible, stating that "a suspect who has once responded to unwarned yet uncoercive questioning is not hereby disabled

---

[17]470 U.S. 298 (1985).

[18]*Id*. at 301.

[19]*Id*.

[20]*Id*.

[21]*Id*. at 314.

from waiving his rights and confessing after he has been given the requisite *Miranda* warnings."[22]

The Court refined that position in *Missouri v. Seibert*.[23]  In *Seibert*, the Court addressed the constitutionality of a "question first" tactic used by law enforcement.[24]  With that tactic, police officers would question a suspect without giving *Miranda* warnings until they received a confession.[25]  Once they received a confession, the officers would give *Miranda* warnings and would elicit another statement based on the previous confession, which they would then seek to have admitted against the defendant.[26]

The Court in *Seibert* found that "when *Miranda* warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and 'depriv[e] a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them.'"[27]  The Court rejected the "question first" tactic and distinguished that situation from the one presented in *Elstad*.  The Court examined a number of factors in doing so, including: "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's

---

[22]*Id*. at 318.

[23]124 S.Ct. 2601 (2004).

[24]*Id*. at 2605.

[25]*Id*.

[26]*Id*.

[27]*Id*. at 2611 (quoting *Moran v. Burbine*, 475 U.S. 412, 424 (1986)).

11

questions treated the second round as continuous with the first."[28]  Examining those factors, the Court concluded that the actions by law enforcement there were inappropriate and the later confession, as well as the first, had to be suppressed.

In this case, Thompson was subjected to custodial interrogation without the benefit of his *Miranda* rights on two occasions on June 2, 2004.[29]  One of these interrogations was conducted at the South Salt Lake Police Department after Thompson was removed from his home.[30]  The second interrogation was conducted by Officer Breinholt while transporting Thompson from the South Salt Lake Police Department to the Utah State Prison, which is being suppressed by this Order.  The next day, Officer Olive interviewed Thompson at the prison.

In considering the factors set out by the Supreme Court in *Seibert*, the Court concludes that this case is more closely related to *Elstad* and, therefore, Thompson's statements made at the prison need not be suppressed.  Before beginning the interview, Officer Olive advised Thompson of his *Miranda* rights and Thompson agreed to waive those rights and speak with Officer Olive. The interview conducted by Officer Olive was conducted the day after the previous interrogations.  There was not a continuance of police personnel, other than the fact that Thompson was being held at the Utah State Prison.  Further, Officer Olive did not treat the second round of questioning as continuous with the first.  Although Officer Olive did read the previous police reports, he was not involved in those interrogations in any way and had not been involved in the investigation up to this point.  This was not a continuous interrogation separated

---

[28]*Id*. at 2612.

[29]The Court does not place the statements made by Thompson in his home in this category since they are admissible as a result of the public safety exception recognized in *Quarles*.

[30]The Court has ordered the suppression of these statements.  *See supra* note 1.

only by a *Miranda* warning.  These were different episodes, involving different officers, and were at different locations.  For these reasons, the Court finds that Thompson's statements made at the Utah State Prison are admissible.

### D.  VOLUNTARINESS OF ALL STATEMENTS

Thompson also challenges all of the above statements claiming that they were involuntary.  He argues that the statements to the officers in his home, the police car, and at the prison were not the product of a free will and rational intellect.  Thompson argues that this was due to a number of factors, including the previous interrogations and his mental state.[31]  The government responds by focusing on the statements given at the prison, where Thompson was advised of and waived his *Miranda* rights.

"A defendant's confession is involuntary if the government's conduct causes the defendant's will to be overborne and 'his capacity for self-determination critically impaired.'"[32]  "Whether a confession was voluntary depends upon the totality of the circumstances, including the crucial element of police coercion, the length of the interrogation and its continuity, the defendant's maturity, education, physical condition, and mental health, and the failure of the police to advise the defendant of his rights to remain silent and to have counsel present during the custodial interrogation."[33]  The Supreme Court has stated "that coercive police activity is a

---

[31]The Court notes that while Defendant has made general allegations concerning his mental state, he has not presented any evidence to show that his mental capacity was diminished in any way.  Defendant points to evidence brought out in the evidentiary hearing that he was emotional and cried a lot during this experience.  The Court believes this to be a natural reaction for a person in such a situation.

[32]*United States v. McCullah*, 76 F.3d 1087, 1101 (10th Cir. 1996) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225–26 (1973)).

[33]*Mitchell v. Gibson*, 262 F.3d 1036, 1059 (10th Cir. 2001).

necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."[34]

The Court will only address the voluntariness of the statement given by Thompson at his residence and the statement given at the prison, since the Court has already ruled that the statements given by Thompson during transport to the prison are inadmissible.  Turning first to the statements given at Thompson's residence, the Court finds that these statements were voluntarily given.  During this incident, the police entered Thompson's residence with their guns drawn and quickly ordered Thompson to the ground.  Thompson was then taken into custody and the officers asked whether there were weapons in the home and whether there were other people in the home.  When Thompson stated that there were guns in the home, an officer asked where they were and Thompson stated they were upstairs.  While the Court acknowledges that this would be a difficult experience for anyone, the Court does not believe that this short interrogation—consisting of only three questions—rises to the level where Thompson's will was overborne.  Further, there was no evidence of any threats or coercion by the police.  For these reasons, the Court finds that statements made by Thompson at his residence were voluntarily given.

The Court turns now to the statements made by Thompson at the Utah State Prison. When Officer Olive arrived, Thompson was in the prison infirmary.  Before interviewing Thompson, Officer Olive received permission from someone at the infirmary to do so.  Officer Olive informed Thompson of his *Miranda* rights.  Thompson agreed to waive those rights and chose to speak with Officer Olive.  Officer Olive testified that during this interview Thompson

---

[34] *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).

14

seemed rational and tracked his questions well.  Officer Olive acknowledged that Thompson was emotional during the interview, that he cried during the interview, and that he asked Officer Olive to stop recording the interview a few times.  Officer Olive complied with each of these requests.  Thompson never sought to end the interview and did not invoke his right to remain silent or his right to counsel.  Additionally, Officer Olive stated that the tone of the interview remained friendly throughout.

The Tenth Circuit has held that "[a]n express written or oral statement or waiver by a defendant of his right to remain silent or of the right to legal assistance of counsel, though not conclusive, is 'usually strong proof of validity of that waiver.'"[35]  Here, Officer Olive informed Thompson of his *Miranda* rights, received a waiver of those rights from Thompson, and Thompson agreed to speak with Officer Olive.  This is strong proof that both the waiver and the statements made were voluntary.  Additionally, there was no evidence of any police coercion or threats.  Thompson seemed rational during the interview and tracked Officer Olive's questions well.  While Thompson was emotional during the interview, there was no point where he sought to end the interview or sought the assistance of counsel.  Rather, he asked Officer Olive to stop recording the interview and Officer Olive complied with these requests.  These facts do not show that Thompson's will was overborne.  Therefore, the Court finds these statements were made voluntarily.

E.  PHYSICAL EVIDENCE FOUND AT THOMPSON'S RESIDENCE

Finally, Thompson seeks to suppress the physical evidence found at his residence as a result of the police search on June 2, 2004.  Thompson argues that this was a warrantless search

---

[35]*United States v. Hack*, 782 F.2d 862, 866 (10th Cir. 1986) (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)).

that does not fall within one of the exceptions to the Fourth Amendment's warrant requirement. The government, however, argues that the search was authorized under the parole agreement that Thompson had agreed to.  Thompson argues that once the warrant was issued for his arrest, he was no longer a parolee and, therefore, the parole agreement no longer applied.

Under the Fourth Amendment, a search conducted without a warrant is per se unreasonable, subject only to a few specifically established and well-delineated exceptions.[36] The Supreme Court has determined that warrantless searches based on a parole agreement falls within the "special needs" exception to the warrant requirement.[37]  The Court has held "that the warrantless search of [a probationer's home], supported by reasonable suspicion and authorized by a condition of probable cause, [is] reasonable within the meaning of the Fourth Amendment."[38]  This is because "probationers and parolees do not enjoy the full suite of rights provided by the Fourth Amendment."[39]

Thompson argues that he was no longer on parole once the arrest warrant was issued and he was arrested.  While the Supreme Court has not addressed this issue, the Tenth Circuit has squarely done so.  In *United States v. Trujillo*, the Tenth Circuit held that a parole agreement remained in effect even after the defendant was arrested.[40]  The court held that the defendant's

---

[36]*Schneckloth*, 412 U.S. at 219.

[37]*See Griffin v. Wisconsin*, 483 U.S. 868, 873–74 (1987).

[38]*United States v. Knights*, 534 U.S. 112, 121 (2001).

[39]*United States v. Trujillo*, 404 F.3d 1238, 1242 (10th Cir. 2005).

[40]*Id*. at 1244.

"arrest did not affect the validity of the parole agreement."[41]  The court also noted that several

other courts had come to the same conclusion.[42]  As a result of these decisions, the Court

concludes that, at the time of his arrest and immediately thereafter, Thompson's parole

agreement remained in effect.

As noted above, Thompson's  parole agreement contained provisions relating to home

visits and warrantless searches:

> Condition No. 4.  Home Visits: "I will permit home visits to my place of
> residence by officers of Adult Probation and Parole for the purpose of ensuring
> compliance with the conditions of my parole.  I will not interfere with this
> requirement; i.e., having vicious dogs, perimeter security doors, refusing to open
> the door, etc."

> Condition No. 5.  Searches: "I will permit officers of Adult Probation and Parole
> to search my person, residence, vehicle or any other property under my control
> without a warrant at any time, day or night, upon reasonable suspicion to ensure
> compliance with conditions of my parole."

As a result of these provisions, Thompson, his residence, his vehicle, or any other property under

his control could be searched without a warrant upon a showing of reasonable suspicion.

"Reasonable suspicion is a less demanding standard than probable cause."[43]  "While

probable cause means 'a fair probability that contraband or evidence of a crime will be found,'

reasonable suspicion is merely a particularized and objective basis for suspecting criminal

---

[41]*Id.*

[42]*See United States v. Jones*, 152 F.3d 680, 687 (7th Cir. 1998) *cert. denied*, 526 U.S.
1069 (1999); *United States v. Martin*, 25 F.3d 293, 296 (6th Cir. 1994); *United States v. Hill*, 967
F.2d 902, 911 (3d Cir. 1992).

[43]*United States v. Treto-Haro*, 287 F.3d 1000, 1004 (10th Cir. 2002).

activity."[44]  "To determine whether the investigating officers had reasonable suspicion, we consider both the quantity of the information possessed by law enforcement and its reliability."[45] These factors are viewed under the totality of the circumstances.[46]

In this case, the investigating officers had a number of pieces of information which, when combined, were sufficient to form reasonable suspicion.  First, Thompson's status as a parolee was considered very poor because of a number of previous violations and his failure to meet with Officer Breinholt.  In fact, his status had become so poor that a warrant was issued for his arrest. Second, Thompson had failed to comply with the provisions of his parole agreement by failing to inform his parole officer that he had moved.  Third, the officers had information that Thompson was involved in a shooting in some way.  Fourth, based on the description of the car that Thompson was driving, the officers had reason to believe that Thompson was in the home when they arrived.  These items show that there was reason to believe that Thompson violated his parole agreement and that he was in the home.  As the Tenth Circuit has stated, "[o]nce there [is] reason to believe that [the defendant] violated his parole agreement, there is, by definition, reasonable suspicion to support a search of his residence to 'ensure compliance' with the conditions of his parole."[47]  For these reasons, the Court concludes that the search of Defendant's home was permissible under the Fourth Amendment and, therefore, the evidence found during that search need not be suppressed.

---

[44]*United States v. Tucker*, 305 F.3d 1193, 1200 (10th Cir. 2002) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quotation omitted)).

[45]*Id*.

[46]*Id*.

[47]*Trujillo*, 404 F.3d at 1245.

III.  CONCLUSION

The Court concludes that the statements made by Thompson at his residence are admissible because they come within the public safety exception to the *Miranda* requirement and that the other statements made by Thompson at his residence were volunteered, and not the result of interrogation.  The statements made by Thompson during transport to the Utah State Prison must be suppressed because they were the result of custodial interrogation and Thompson was not advised of his *Miranda* rights.  Thompson's statements made at the Utah State Prison are admissible because they were voluntarily given after Thompson had been advised of and waived his *Miranda* rights.  Finally, the Court concludes that the evidence found during the search of Thompson's residence is admissible because that search was conducted pursuant to a parole agreement which Thompson was still subject to at the time of his arrest.

It is therefore

ORDERED that Defendant's Motion to Suppress (Docket No. 21) is GRANTED IN PART and DENIED IN PART.  It is further

ORDERED that the time from the filing of the Motion to Suppress—April 19, 2005—through the date of October 31, 2005, is excluded from the computation of the Speedy Trial Act time pursuant to 18 U.S.C. § 3161(h)(1)(F) and (J).

DATED   October 31, 2005.

BY THE COURT:

_____
TED STEWART
United States District Judge

19